**Reversed and Remanded and Opinion Filed January 15, 2014**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-13-00692-CV**

_____

**IN THE INTEREST OF N.L.T., A CHILD**

**On Appeal from the 256th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF04-10316-Z**

_____

**No. 05-13-00693-CV**

_____

**IN THE INTEREST OF M.T., A CHILD**

**On Appeal from the 302nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF06-08087-U**

## OPINION

Before Justices Francis and Lang-Miers, and Chief Justice Thomas, Ret.[1]
Opinion by Chief Justice Thomas

In September 1987, sixteen-year-old S.T. (Mother), unrepresented by counsel, had a default judgment rendered against her terminating her parental rights to her ten-month-old daughter. More than twenty-five years later, the Texas Department of Family and Protective Services relied on that default judgment as the sole substantive ground for terminating Mother's

_____

[1] The Honorable Linda Thomas, Chief Justice of the Court of Appeals for the Fifth District of Texas ─ Dallas, Retired, sitting by assignment.

parental rights to her two children, N.L.T. and M.T.  The cases were consolidated for trial before the court.  The trial court found in the Department's favor and terminated Mother's parental rights.

Among other things on appeal, Mother argues she received ineffective assistance when her appointed counsel failed to challenge the statute under which her parental rights were terminated as an unconstitutional retroactive law as applied to her.  After reviewing the record and for reasons set out below, we agree with Mother. Accordingly, we reverse the trial court's judgments and remand for a new trial.

## BACKGROUND

In December 2009, the Department received several referrals that N.L.T. and M.T., ages six and four respectively, were living in unsanitary and unstable conditions with Mother, who had been diagnosed as bipolar with schizophrenic features.  According to the referrals, Mother was not taking her medications and was "exhibiting increasing signs of paranoia and mental instability."  After investigating, the Department took custody of the children and filed a suit affecting the parent-child relationship.  The parties ultimately reached an agreement to appoint a maternal aunt as sole managing conservator of the children and to give Mother supervised visitation.  The trial court rendered an order in December 2010 adopting the terms of the parties' agreement.  Sometime thereafter, Mother moved in with the aunt and the children.

In March 2012, the Department removed the children from the aunt's custody when it discovered the aunt was physically abusing and starving M.T.  At the time of the removal, Mother was a patient in Green Oaks Hospital.  The Department moved for conservatorship of both children and sought to terminate Mother's parental rights if reunification could not be

achieved.[2]  As grounds for termination, the petition alleged eighteen of the twenty statutory substantive grounds set out in section 161.001(1) of the Texas Family Code: (A), (B), (C), (D), (E), (F), (G), (I), (J), (K), (L), (M), (N), (O), (P), (Q), (R), and (S).  *See* TEX. FAM. CODE ANN. § 161.001(1) (West Supp. 2013).  At trial, however, the State abandoned all grounds for termination except subsection (M), which authorized the trial court to terminate the parent-child relationship if it found by clear and convincing evidence that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state" and that termination was in the child's best interest.  *Id.* § 161.001(1)(M), (2). Grounds (D) and (E) allow termination of parental rights when a parent has engaged in conduct or placed a child with another who engaged in conduct that endangered the child's physical or emotional well-being.  *See id*. § 161.001(1)(D), (E).

Briefly, the evidence at trial and at the new-trial hearing in these cases showed Mother gave birth to a baby girl in October 1986 when she was sixteen and using cocaine. She admitted the child was born with cocaine in her system.  When the child developed respiratory problems in January 1987, Mother took the child to the hospital, and the doctors found burns on the child's back that Mother could not explain. The doctors referred the child to the Department, and Mother's parental rights to the child were terminated in September 1987.  In the termination decree, the trial court found Mother had "knowingly placed and knowingly allowed the child to remain in conditions and surroundings which endanger the physical and emotional well-being of the child, and has engaged in conduct . . . which endangers the physical and emotional well-being of the child."  Mother testified at the trial in this case that the child was not burned; rather,

---

[2] The rights of the biological fathers were also terminated but are not issues in these appeals.

she explained the child had "so much cocaine in her system, the stuff had to come out [of] her system [and] left marks on both side[s] of her" body.

With regard to N.L.T. and M.T., the children the subject of this suit, the Department stipulated at trial that Mother "had no fault at all in the current removal." However, the Department presented evidence that since 2009, Mother voluntarily admitted herself to Green Oaks on five separate occasions when she was stressed or upset and needed time "to gather [her] thoughts." Mother testified she suffered a nervous breakdown in 1992 when her father died and again in 2010. Medical testimony showed Mother was diagnosed with schizoaffective and bipolar disorders, but she denied the need for antipsychotic medication and declined prescriptions for those symptoms. The month before trial, Mother tested positive for use of cocaine and benzoylecgonine. She admitted regular use of marijuana but denied using cocaine after 1990. She said her ex-boyfriend was a cocaine dealer and the cocaine got in her hair and on her "hands and stuff like that" because of her association with him.

The evidence also showed that M.T. was diagnosed with autism, but Mother believed his behavior was related to a hearing problem. She said M.T. was diagnosed with mental retardation and "autistic ways" but not "per say [sic] autistic." However, she testified that she planned to send M.T. to a school for autistic children because "[t]hey keep saying that he's autistic[.]" The evidence showed that M.T.'s behavior had improved considerably after being placed in a foster home experienced with autistic children.

N.L.T. was in the foster home with M.T. for six months but was removed "for a variety of behaviors" described as "red flags." In particular, N.L.T. was "acting out" sexually towards the boys in the home, wrote "sexually explicit things" on her bedroom furniture, and smeared feces on the wall of her bedroom and on her sheets. Ultimately, she was placed in Timberlawn Hospital, where it was determined she "was having signs of schizophrenia" and needed a "more

–4–

structured environment." At the time of trial, N.L.T. was at a treatment facility, where she was taking psychotropic medications and receiving intense therapy. There was no time frame for her release from the facility because it depended on her improvement.

Finally, Mother's criminal history presented in evidence at trial included convictions for aggravated robbery and credit card abuse in 1987, theft and escape in 1990, aggravated assault on a correctional officer in 1992, disorderly conduct in 2005, and felony theft in 2011.

### CONSTITUTIONALITY OF SUBSECTION (M) AS APPLIED TO MOTHER

In her first issue, Mother argues the trial court's application of family code section 161.001(1)(M) to her, by using the 1987 termination of her parental rights to her first child as the ground for terminating her rights to her children in 2013, violated the Texas Constitution's prohibition against retroactive laws. The State argues Mother did not present this issue below and, consequently, it is not preserved for our review.

We agree the as-applied constitutional issue was not preserved by trial counsel. Mother does not cite the record where she raised the issue below and, in fact, argues her trial counsel was ineffective because she did not raise the issue in the trial court. As a general rule, a party must raise an issue below to preserve it for review on appeal. *See* TEX. R. APP. P. 33.1. This rule applies to constitutional issues. *See In re S.A.S.*, 200 S.W.3d 823, 826 (Tex. App.—Beaumont 2006, pet. denied). Consequently, we conclude Mother did not preserve this issue for our review.

However, in her second issue, Mother argues trial counsel was ineffective for failing to raise the issue of the constitutionality of subsection (M). The State contends this also was not preserved, but we disagree. Mother's motion for new trial raised the issue of the constitutionality of subsection (M) under her ineffective assistance of counsel claim, and we will address the constitutionality issue under that claim.

**Applicable Law and Standard of Review**

An indigent parent is entitled to appointed counsel in parental rights termination cases, and that statutory right "embodies the right to effective counsel." *In re B.G.*, 317 S.W.3d 250, 253–54 (Tex. 2010). In evaluating the effectiveness of counsel in such cases, the Texas Supreme Court has adopted the *Strickland* test that sets standards for effective assistance in criminal cases. *See In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

Under *Strickland*, to prevail on a claim of ineffective assistance of counsel, an appellant must show that trial counsel's performance was deficient and that this deficiency prejudiced the defense. *Id.* (citing *Strickland*, 466 U.S. at 687–88). Both prongs of the inquiry must be established. *Id.* The *Strickland* standard requires a showing that counsel's errors were serious enough to deprive the appellant of a fair trial whose result is reliable. *Strickland*, 466 U.S. at 687.

In evaluating a claim in a particular case, we consider all of the circumstances surrounding the case, and must primarily focus on whether counsel performed in a "reasonably effective manner." *In re M.S.*, 115 S.W.3d at 545. In doing so, we must indulge in the presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* Counsel's performance falls below acceptable levels when the "representation is so grossly deficient as to render the proceedings fundamentally unfair . . . ." *Id.* (quoting *Brewer v. State*, 649 S.W.2d 628, 630 (Tex. Crim. App. 1983)). It is only when "the conduct was so outrageous that no competent attorney would have engaged in it" that the challenged conduct will constitute ineffective assistance. *Id.* While a single error will not typically result in a finding of ineffective assistance of counsel, an egregious error may satisfy the *Strickland* prongs on its own. *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011).

Because Mother presented her ineffective assistance of counsel claim in a motion for new trial, which the trial court orally denied after a hearing, we analyze the issue as a challenge to the denial of her motion for new trial. *Walker v. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We apply the *Strickland* test through an abuse of discretion standard and reverse only if the trial court's decision is arbitrary or unreasonable, viewing the evidence in the light most favorable to the ruling *Id.* We give almost total deference to the trial court's determination of historical facts that are supported by the record. *Id.* But, a trial court has no discretion in determining what the law is and abuses its discretion if it interprets or applies the law incorrectly. *In re Dep't of Family & Protective Servs.,* 273 S.W.3d 637, 642–43 (Tex. 2009) (orig. proceeding).

## Discussion

The plain wording of subsection (M) authorizes termination of parental rights if a parent has had her rights to another child terminated previously based on a finding that the parent's conduct violated subsection (D) or (E) and a finding that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1)(M), (2). It is undisputed that subsection (M) did not exist when Mother's rights to her other child were terminated in 1987.[3] To support her argument that subsection (M) is unconstitutional as applied to her, Mother relies on the prohibition against retroactive laws in the Texas Constitution, which states that "[n]o bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." TEX. CONST. art. 1, § 16. The Department concedes the statute "looks backward" and retroactivity

---

[3] Subsection (M) was enacted in 1989. *See* Act of May 24, 1989, 71st Leg., R.S., ch. 808, § 1, 1989 Tex. Gen. Laws 3673, 3674 (current version at TEX. FAM. CODE ANN. § 161.001(1)(M)).

"seems to be implicit in the statute," but it argues the best interest of the child is "a recognized exception" to the prohibition against unconstitutional retroactive laws.

A retroactive law literally means a law that acts on things which are past. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002). But mere retroactivity is not sufficient to invalidate a statute. *Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 139 (Tex. 2010). Most statutes operate to change existing conditions, and not every retroactive law is unconstitutional. *Id.*

In *Robinson*, the supreme court engaged in a lengthy analysis of retroactive laws, observing that the presumption against retroactivity has "two fundamental" objectives: (1) it protects the people's reasonable, settled expectations, and (2) it protects against abuses of legislative power. *Id.* Although the court recognized that no bright-line test for unconstitutional retroactivity is possible, it stated that, in determining whether a statute is unconstitutionally retroactive, we must consider three factors in light of the prohibition's dual objectives: (1) the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings, (2) the nature of the prior right impaired by the statute, and (3) the extent of the impairment. *Id.* at 145. As reasoned by the court:

> The perceived public advantage of a retroactive law is not simply to be balanced against its relatively small impact on private interests, or the prohibition would be deprived of most of its force. There must be a compelling public interest to overcome the heavy presumption against retroactive laws. To be sure, courts must be mindful that statutes are not to be set aside lightly. . . . But courts must also be careful to enforce the constitutional prohibition to safeguard its objectives.

*Id.* at 145–46.

### Nature of Prior Right Impaired and Extent of Impairment

Using the standards set out above, we begin, as the supreme court did, by first considering the nature of the rights claimed by Mother and subsection (M)'s impact on them. *See id.* at 147.

Mother argues it is undisputed that her right "in the care, custody, and control of [her] children is perhaps the oldest of the fundamental liberty interests recognized." The supreme court has agreed that a parent's right to rear her child is "fundamental," "one of constitutional dimensions," and "far more precious than any property right[.]" *See id.* at 145 (citations omitted); *In re J.F.C.*, 96 S.W.3d 256, 273 (Tex. 2002). And it has recognized that a termination proceeding "seeks not merely to infringe that fundamental liberty interest, but to end it." *In re J.F.C.*, 96 S.W.3d at 273 (quoting *Santosky v. Kramer*, 455 U.S. 745, 759 (1982)). Consequently, the court has stated that "the private interest in a parental termination case [is] 'a commanding one.'" *Id.* (quoting *Santosky*, 455 U.S. at 759). Termination of the parental relationship "is complete, final, irrevocable. It divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976).

The Department concedes that Mother's "interest in her children [is] a strong right and termination acts to impair that interest," but it does not engage in any analysis beyond its argument that "in light of the facts of the case, the application of subsection (M) [is] not unconstitutionally retroactive." It argues "subsection (M) is not taken in a vacuum, [and] it is the existence of the acts which caused the original termination coupled with a continuing pattern of endangering conduct that supports the termination." At oral argument, the Department argued we must also consider evidence related to the best interest of the children when determining the constitutionality of subsection (M). The Department has not cited any case to support this argument.

The law is settled that in proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the

–9–

child.  TEX. FAM. CODE ANN. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  In other words, the state agency seeking termination must prove both that the parent engaged in conduct proscribed by the statute and best interest.  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  *See Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987).

Thus, to the extent the State argues evidence on best interest of the children can somehow be used to correct any constitutional infirmities on the substantive ground, we cannot agree.  To do so would allow the State to use best interest impermissibly to perform "double duty" when terminating parental rights.  In summary, we conclude that subsection (M) significantly impacts Mother's fundamental right to raise her children.

### Nature of Public Interest

We next consider the nature of the public interest and the extent to which subsection (M) serves that interest.  Although we have no legislative findings regarding subsection (M), Mother cites a bill analysis reflecting that the statute was "primarily aimed at protecting newborn children of known child abusers" and "would allow a court to take a child away from a parent already judged to be a child abuser or murderer, terminate parental rights, and allow that child to be adopted into a safer environment."  *See* House Comm. on Judicial Affairs, Bill Analysis, Tex. H.B. 581, 71st Leg., R.S. (1989).  Mother argues because her children were not newborns, the Department's interest is served by the numerous other provisions of section 161.001(1) and its interest in subsection (M) as applied to her is slight at best.

The Department counters by asserting the public's general interest in protecting children.  It argues subsection (M) allows the Department "to act *before* a child is actually harmed when a parent has had her rights previously terminated for harming another child."  The Department's argument, however, ignores the fact it relied on Mother's conduct more than twenty-five years

–10–

ago as the sole substantive ground to terminate her rights to N.L.T. and M.T., and not when the children were newborns, but when they were eight and nine years old. And the Department stipulated that Mother's conduct now was not the basis for the removal of N.L.T. and M.T.

While we agree the safety and welfare of children are significant interests that need protection, those interests are weakened when, as here, the termination is based on conduct that occurred more than a quarter of a century ago. As *Robinson* explained, "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly[.]" *Robinson*, 335 S.W.3d at 139 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265–66 (1994)). At the time Mother's parental rights to her first child were terminated, subsection (M) had not been enacted. And, there was nothing she could do to conform her conduct to the statute once it was enacted. Moreover, it is difficult to imagine that Mother could have expected such a result.

> The supreme court recognized
>
> that an important reason for the constitutional prohibition against retroactive laws is to preempt this weighing of interests absent compelling reasons. Indeed, it is precisely because retroactive rectification of perceived injustice seems so reasonable and even necessary, especially when there are few to complain, that the constitution prohibits it.

*Id.*, 335 S.W.3d at 150. We conclude the Department's reliance on subsection (M) as the sole ground for termination in this case is an unconstitutional retroactive application of the law as applied to Mother. The Department's argument that we must consider the current circumstances in our analysis would result in a "weighing of interests absent compelling reasons" and we decline to do so. We conclude the public interest in applying subsection (M) to the facts of this case are slight.

Considering the *Robinson* factors in light of the dual objectives in prohibiting retroactive laws, we conclude that subsection (M) is unconstitutionally retroactive as applied to Mother.

–11–

Consequently, trial counsel was deficient in failing to raise the issue at trial. Because subsection (M) was the only ground relied upon for termination, we further conclude counsel's failure to raise the issue was prejudicial. We sustain the second issue. Our disposition of the second issue makes it unnecessary to discuss any of the other issues raised in Mother's brief.

We reverse the trial court's judgments terminating Mother's rights to N.L.T. and M.T. and remand for a new trial to commence no later than 180 days after the mandate is issued by this Court. *See* TEX. R. APP. P. 28.4.

130692F.P05

/Linda Thomas/
LINDA THOMAS
CHIEF JUSTICE, Retired



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF N. L. T., A CHILD

No. 05-13-00692-CV

On Appeal from the 256th Judicial District Court, Dallas County, Texas

Trial Court Cause No. DF04-10316-Z.

Opinion delivered by Chief Justice Thomas, Ret.; Justices Francis and Lang-Miers participating.

In accordance with this Court's opinion of this date, the trial court's April 29, 2013 Decree of Termination is **REVERSED** and this cause is **REMANDED** to the trial court for a new trial to commence no later than 180 days after the mandate is issued by this Court. *See* Tex. R. App. P. 28.4.

Judgment entered this January 15, 2014

/Linda Thomas/

LINDA THOMAS
CHIEF JUSTICE, RET.



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF M.T., A CHILD

No. 05-13-00693-CV

On Appeal from the 302nd Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF06-08087-U.
Opinion delivered by Chief Justice Thomas, Ret.; Justices Francis and Lang-Miers participating.

In accordance with this Court's opinion of this date, the trial court's April 29, 2013 Decree of Termination is **REVERSED** and this cause is **REMANDED** to the trial court for a new trial to commence no later than 180 days after the mandate is issued by this Court. *See* TEX. R. APP. P. 28.4.

Judgment entered January 15, 2014

/Linda Thomas/
LINDA THOMAS
CHIEF JUSTICE, RET.